**In re Brian LYNN, Debtor.**

**Brian LYNN, Plaintiff,**

v.

**FINANCIAL SOLUTIONS CORP., Defendant.**

**Bankruptcy No. 394–03378GP–13.**

**Adv. No. 94–0249A.**

United States Bankruptcy Court, M.D. Tennessee.

Oct. 25, 1994.

As Amended Dec. 12, 1994.

Martin Sir, Cross & Sir, Nashville, TN, for Brian Lynn.

Joseph P. Rusnak, Tune Entrekin & White, P.C., Nashville, TN, for Financial Solutions Corp.

## MEMORANDUM

GEORGE C. PAINE, II, Chief Judge.

## I. INTRODUCTION

Brian Keith Lynn, debtor and plaintiff ("plaintiff"), initiated this adversary proceeding against Financial Solutions Corporation's ("FSC") seeking turnover to the bankruptcy estate of a 1988 Volvo White Truck pursuant to 11 U.S.C. § 542. FSC repossessed the truck upon plaintiff's default of a "Pawn Agreement" executed between these parties. Plaintiff alleges that the "Pawn Agreement" and FSC's subsequent repossession and sale of the truck violated applicable state law. For the reasons hereinafter cited, this Court finds that the "Pawn Agreement" is void as a matter of law, and orders turnover of the truck to the bankruptcy estate or alternative-ly that FSC pay to the estate a sum equal to the value of the truck which this court finds to be $40,000. The following memorandum contains this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II. JURISDICTION

This court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), and (O).

## III. FINDINGS OF FACT

Plaintiff is a resident of Lebanon Tennessee, and prior to repossession of the truck, was engaged as a private hauler of livestock. FSC is a Tennessee corporation licensed to do business in the state of Tennessee. Rick Burton is secretary of FSC, and his wife is president and 90% stockholder of the corporation. FSC received its pawnbrokers license in accordance with the Tennessee Pawnbrokers Act of 1988 codified at T.C.A. § 45–6–201 *et seq.*

The subject truck is an eighteen-wheel vehicle which plaintiff used in the course of his employment. Plaintiff testified that the present value of his truck was $40,000. In July of 1993, plaintiff's parents, James and Margaret Lynn, transferred ownership of the subject truck to plaintiff, and that transfer was properly recorded. James Lynn also testified that the value of the truck was between $40,000 and $44,000. Shortly following this transfer, plaintiff and FSC entered into a "Security Agreement" whereby FSC made a loan to plaintiff secured by FSC's retention of a set of keys, and negotiable title to the truck. Plaintiff was allowed to keep actual possession of the truck, but a payment schedule was arranged whereby plaintiff was to meet each payment deadline or FSC would declare the loan in default. By the terms of the "Security Agreement," FSC was allowed to repossess the truck upon plaintiff's default.

On March 9, 1994 plaintiff again went to FSC seeking a loan in exchange for a security interest in his truck. FSC and plaintiff

agreed that FSC would retain a set of keys, certificate of title, and plaintiff's power of attorney with respect to the truck in exchange for a $3,000 loan.[1] Once again, however, plaintiff was allowed to keep actual possession of his truck during the pendency of the loan. The terms of this loan required that plaintiff make weekly payments of $405 for an approximately three month period which included charges and interest described on the back of the pawn agreement as follows:

*DISCLOSURE*

I agree and acknowledge that the Pawnbroker is charging an interest rate of two percent (2%) per month, plus additional pawn/loan services of twenty percent (20%) which include a researched loan value, an appraisal fee, documentation fee, contract fee, general bookkeeping, loan updates, police reports and delivery, research for police checks, personal notice, public notice, title search, handling and all other related expenses.

In addition, the pawn agreement provided that if plaintiff failed to pay when due, the loan would be considered in default. The agreement also set forth FSC's rights in the event of default:

Upon default all unpaid installments shall, at Pawnbroker's option become due immediately and payable.... Whenever the Pawnor is in default hereunder, and upon demand by Pawnbroker, Pawnor shall assemble the pledged property and make it available to Pawnbroker at a place reasonably convenient to Pawnbroker and Pawnor.

Plaintiff's first and second payments came due on March 18 and 25. He missed both of those payments. Plaintiff's next payment was due on April 1. On that date, plaintiff paid FSC $810 for the first two payments, but failed to make any further payments. FSC branch manager, Karen Bayne, testified that after April 1, she attempted on several occasions, but to avail, to contact plaintiff regarding his failure to pay.

On May 2, 1994 FSC asserts that it mailed to plaintiff a letter informing him that the loan was in default, and that plaintiff had until May 12 to redeem "his pledged property" or the same would be forfeited under the terms of the March 9, 1994 "Pawn Agreement." Plaintiff denies that he received such a letter. Also on May 2, 1994 FSC published in the *Nashville Business Journal* a public notice that plaintiff's "pledged property" would be forfeited if he did not redeem on or before May 12, 1994. Although plaintiff stipulated that such was published, he testified that he was unaware of the *Nashville Business Journal* notice.

On May 16, FSC repossessed the truck from plaintiff. The following day, FSC sold the truck to Rick Racing & Leasing, a sole proprietorship owned and operated by Rick Burton and his wife. The sale was a private sale with no notice to plaintiff. Although Rick Burton testified that it was normal practice to grant a loan for 25% of the value of the "pledged property," Rick Racing & Leasing issued a check for $4,050 to FSC for sale of the truck. On May 18, the day following the sale, plaintiff filed his petition for Chapter 13 bankruptcy. Shortly thereafter, plaintiff initiated this adversary proceeding seeking turnover of the truck naming FSC as the only defendant.

## IV. CONCLUSIONS OF LAW

### A. Introduction

Only property in which the Debtor has a legal or equitable interest can become property of the bankruptcy estate. 11 U.S.C. § 541(a). To determine the extent of the debtor's interest, this Court must look to property rights as defined under state law. 11 U.S.C. § 541(a)(1). In this case, the March 9, 1994 transaction between the parties is governed by the Tennessee Pawnbrokers Act of 1988 ("TPA"), codified at T.C.A. § 45-6-201 *et seq.*

### B. The Tennessee Pawnbrokers Act of 1988

■ The TPA establishes licensing and other regulatory requirements for Tennessee

---

1. Plaintiff was actually given only $2,570. The remaining portion of the loan was kept by FSC to satisfy a previous indebtedness.

pawnbrokers. The statutes are penal in nature, and must therefore be strictly construed. *Epstein v. State*, 211 Tenn. 633, 366 S.W.2d 914 (1963). The TPA empowers pawnbrokers to:

(1) Make loans on pledges of any nature;

(2) Lend money on bottormy and respondentia security, at marine interest;

(3) Deal in bullion, stocks, and public securities;

(4) Purchase tangible personal property from individuals on the condition it may be redeemed or repurchased by the seller at a fixed price within a fixed time not to be less than sixty (60) days;

(5) Make loans on real estate, stocks, and personal property; and

(6) Purchase merchandise for resale from dealers and traders; and

(7) Use its capital and funds in any lawful manner within the general scope and purpose of its creation.

T.C.A. § 45–6–204(a) (1993). The TPA also establishes specific requirements for "pawns" and "pawn transactions." The TPA defines these as follows:

"Pawn" or "pawn transaction" means either or the following transactions:

(A) "Buy–Sell agreement" means any agreement whereby a purchaser agrees to hold a property for a specified period of time not to be less than sixty (60) days to allow the seller the exclusive right to repurchase the property. A buy-sell agreement is not a loan of money, but shall still meet all recording procedures to law enforcement officers as with a pawn transaction; or

(B) "Loan of money" means a written bailment of personal property as security for an engagement or debt, redeemable on certain terms and with the implied power of sale on default;

T.C.A. § 45–6–203(2) (1993).

The TPA requires that in the course of a "pawn" or "pawn transaction," be it a "buy-sell agreement" of a "loan of money," that the pawnbroker take and retain actual possession of the pledged property to secure repayment. "Pledged goods" is also a defined term within the TPA:

"Pledged goods" means tangible personal property which is deposited with or otherwise ***actually delivered*** into the possession of a pawnbroker in the course of his business in connection with a pawn transaction.

T.C.A. § 45–6–203 (1993 & Supp.) (emphasis added). Furthermore, the TPA also envisions that the pawnbroker exercise his right of resale or forfeiture only within the confines of the statute. The TPA does not contain a provision for "repossession" in that the statute contemplates that the pawnbroker is already holding the "pledged good." This point is further emphasized by the TPA's dictate that the pawnbroker provide a safe place for the pledge, as well as sufficient insurance coverage on the property holding the pledge. *See* T.C.A. § 45–6–215 (1993).

■ Pawnbrokers are however, entitled to engage in other loan transactions which would not fall within the definition of "pawn" or "pawn transaction" as indicated by the language of T.C.A. § 45–6–204 as reproduced above. The authority to engage in other transactions may also be inferred from the statutory language allowing pawnbrokers to use their capital and funds in any lawful manner. However, a pawnbroker's right to exercise these other listed transactions is tempered by the language of T.C.A. § 45–6–204(b) which states that:

(b) Notwithstanding the provisions of this section, no pawnbroker shall have the powers enumerated in this section without first complying with the laws regulating the particular transaction involved.

T.C.A. § 45–6–204(b) (1993). It appears therefore, that a licensed pawnbroker can lend money on the security of a motor vehicle while allowing the borrower to retain possession of his vehicle provided that the loan is not otherwise a "pawn" or "pawn transaction," and the pawnbroker complies with other applicable laws.[2]

---

**2.** *See* Office of the Attorney General Opinion No. U93–36 (March 29, 1993).

## C. "Pawn" or "Pawn Transaction"

█ In the case now under consideration, FSC structured the transaction as a "pawn" or "pawn transaction," but failed to take actual possession of the truck as is required by T.C.A. § 45–6–203. As a penal statute which must be strictly construed, the clear language of that statute requires that the pledged good be "actually delivered" to the pawnbroker. FSC's argument that realty cannot be actually delivered, and therefore "actual delivery" is broad enough to encompass constructive delivery is faulty. The authority of the pawnbroker to lend money on realty is not a "pawn" or "pawn transaction" requiring actual delivery because it is listed in the laundry list of other powers of the pawnbroker under T.C.A. § 45–6–205. In that case, the pawnbroker must still comply with all other applicable law governing the loan of money with realty as security for that loan. However, FSC's transaction with plaintiff in the form of a "pawn" or "pawn transaction" requires actual delivery pursuant to T.C.A. § 45–6–203.

█ In addition to failing to take actual delivery as required by the TPA, this Court is of the opinion that FSC further violated the TPA provision regulating interest and other charges. That statutory section provides that:

**45–6–210. Rate of interest—Other charges permitted.**—No pawnbroker shall demand or receive an effective rate of interest greater than twenty-four percent (24%) per annum, and no other charge of any description, for any purpose whatsoever shall be made by the pawnbroker; except that the pawnbroker may charge, contract for and receive a *reasonable* fee for investigating the title, storage, and insuring the security, closing the loan, making daily reports to local law enforcement officers and for other expenses, losses of every nature whatsoever and fall all other services. Such a fee when made and collected shall not be deemed interest for any purpose of law.

T.C.A. § 45–6–210 (1993) (emphasis added). In the March 9, 1994 agreement, FSC contracted to receive the lawful interest rate of two percent (2%) per month of the value of loan. In addition, however, FSC sought a supplementary pawn/loan service fee of twenty percent (20%) per month. While T.C.A. § 45–6–210 permits such fees, it requires that such be reasonable. When questioned by the Court, Rick Burton stated that FSC was required to file the police report, perform a title search, provide public and personal notice during the redemption period, and perform regular bookkeeping. However, Burton stated that because plaintiff had borrowed from FSC before, some of the normal fees incurred in this type of transaction were not actually incurred in this instance.

The interest on the $3,000 loan at 2% per month totals $180. In order to meet his pawn redemption value, plaintiff had to pay a total of $4,860. Mathematically therefore, plaintiff was required to pay $1,680 in pawn/loan fees for a $3,000 loan that had a repayment life of less than three full months. It is the opinion of this Court, given Rick Burton's testimony of what service were actually performed in this case, that FSC failed to comply with the "reasonable" requirement of T.C.A. § 45–6–210. The $1,680 pawn/loan fee simply does not bear a reasonable relationship to the services actually performed.

█ This court is further of the opinion that FSC's loan to debtor in the form of a "pawn" or "pawn transaction" was in contravention of yet another provision of the TPA. Tennessee Code Annotated, section 45–6–211 sets forth the prerequisites in order for the pawnbroker to forfeit the pledged goods upon failure of the pawnor to redeem:

**45–6–211. Notice to Pledgor—Failure to Redeem.**—(a) In every transaction made under a loan of money transaction as defined herein, the pawnbroker shall retain possession of every pledge or pawn fifty (50) days after maturity of the loan.

(b) If the pledgor shall fail or neglect for fifty (50) days after maturity of the loan to redeem the pledged property, the pawnbroker shall thereafter mail a notice to the pledgor to the address designated by the pledgor on the stub of the record required to be kept in § 45–6–209.... [T]he notice shall advise the pledgor that the described property must be redeemed

within ten days of the date of the notice, and must specify a date, and upon the pledgor's failure to redeem within the specified time, the pledge shall be forfeited to the pawnbroker and all right, title and interest of the pledgor to redeem thereafter divested.

T.C.A. § 45–6–211 (1993).

In the case at bar, the "Pawn Agreement" states that "[t]his pawn matures upon execution of this contract ..." indicating maturity as of March 9, 1994. The pawn agreement also shows plaintiff's final $405 payment due on June 3, 1994, and states in the language of the contract that upon default all payments become "immediately due and payable," and furthermore that "[p]awnbroker may waive any default ... without affecting its right to declare a subsequent default hereunder and accelerate the maturities of the obligation."

Maturity is not a defined term under the TPA, but is defined in *Black's Law Dictionary* as "the date at which an obligation such as the principal of a bond or note, becomes due." BLACK'S LAW DICTIONARY 883 (5th ed. 1979). This Court is of the opinion that maturity cannot, as a matter of fairness, logic or law, be the date of execution of the "Pawn Agreement" unless that agreement had called for immediate repayment on March 9, 1994 or FSC had accelerated the loan upon a default on that same date.

■ As stated earlier herein, the TPA is a statute which is penal in nature, and must be strictly construed. When the legislature demanded in T.C.A. § 45–6–211 that the pawnbroker hold the pledge for a minimum of fifty (50) days upon "maturity of the loan" before the pawnbroker may begin to exercise its right of forfeiture, this Court believes the legislature intended "maturity" in its natural and ordinary meaning. "Maturity of the loan" was intended to mean when the loan become dues, be it by default and acceleration or by the arrival of the due date as given on the face of the agreement.

Rick Burton testified that although plaintiff failed to make his April 1, 1994 payment, FSC waited until May 2, 1994 before allegedly sending plaintiff the ten-day statutory notice of redemption in order to allow the fifty days to expire. The contract matured, at the very earliest on April 1, 1994, when FSC could have accelerated the balance due upon plaintiff's failure to make his April 1, 1994 payment as scheduled. The soonest, therefore, that FSC could have sent the redemption notice was May 21, 1994, making forfeiture not possible until May 31, 1994. In the context of a "pawn" or "pawn transaction" FSC thus failed to retain possession of the pledged good for the mandatory minimum of fifty days following "maturity of the loan" as required by the TPA, and failed to give plaintiff proper notice of his opportunity for redemption.

For all of the above stated reasons, this Court finds that both the terms of the "Pawn Agreement" and the conduct of FSC violated the TPA[3].

## D. Application of Article 9 of the Uniform Commercial Code

■ Even if the transaction were to be construed as a mere loan other than a "pawn" or "pawn transaction," FSC nonetheless failed to comply with other applicable law as is required by T.C.A. § 45–6–204. If the transaction was merely a "loan on a pledge of any nature" pursuant to T.C.A. § 45–6–204(a)(1), then FSC would be governed by Article 9 of the Uniform Commercial Code ("UCC") as codified in Tennessee at 47–9–101 *et seq*.

The UCC defines a secured party as "a lender, seller or other person in whose favor there is a security interest." T.C.A. § 47–9–105(m) (1992). Under the UCC, a secured party is entitled upon default to repossess either by self-help without a breach of the peace, or by pursuing an enforcement action. T.C.A. § 47–9–503 (1992). Upon repossession of the collateral, T.C.A. § 47–9–504 regulates how the secured party may dispose of the property. The UCC gives the secured

---

**3.** FSC relies heavily upon *In re Dunlap*, 158 B.R. 724 (M.D.Tenn.1993), a 1993 decision by the United States District Court for the Middle District of Tennessee. *In re Dunlap* states that once the redemption period has expired, the pawnor/debtor loses all legal and equitable interest in the pawned goods, and may not utilize 11 U.S.C.

§ 1322 to protect his interest up to the point of sale by the pawnbroker. That case is not applicable to these facts, and is readily distinguishable from the case *sub judice* in that in *Dunlap* there was no allegation of violation of the TPA by the pawnbroker.

party the right to dispose of the collateral in any "commercially reasonable manner" including a public or private sale. However, upon either a public or private sale, the secured party must give the debtor reasonable notice of the time and place of a public sale, and time after which a private sale is to be held. T.C.A. § 47–9–504(3) (1992). Furthermore, the sale must be commercially reasonable as to method, time, place, and terms. T.C.A. § 47–9–504(3) (1992).

FSC's "loan on a pledge of any nature" failed to comply with Article 9. More specifically, FSC's sale of the 1988 Volvo White truck to Rick Racing & Leasing was not "commercially reasonable" as that term is used in T.C.A. § 47–9–504(3). FSC failed to give plaintiff proper notice of the sale; conducted a private sale unreasonable in its method; and received a sale price of $4,050 which was grossly inadequate to the value of the truck which this Court found in its findings of fact herein to be approximately $40,000.

### E. Conclusions

■ For violation of the TPA and/or the UCC, this Court finds that the March 9, 1994 "Pawn Agreement" to be void *ab initio*. The "Pawn Agreement" is in contravention of both statutory and common law and is declared void as a matter of law.[4] This Court finds in favor of the plaintiff on his complaint for 11 U.S.C. § 542 turnover. FSC is ordered to either relinquish to the bankruptcy estate the 1988 Volvo White truck, or the sum of $40,000 which the Court deems to be the present value of the truck to the estate.

It is, THEREFORE, so ordered.

ORDER GRANTING FIRST AMENDED AND RESTATED MOTION TO ALLOW ADDITIONAL FINDINGS OF FACT

Dec. 12, 1994

This matter came to be heard on December 6, 1994 upon the "First Amended and Restated Motion to Allow Additional Findings of Fact, Combined with Request for Expedited Hearing Thereon" filed November 21, 1994 (the "Motion"). Upon consideration of the Motion, the arguments of counsel, and

the entire record in this case and it appearing to the Court that the debtor does not oppose the relief requested in the Motion and that sufficient cause exists, it is hereby

ORDERED that the Motion shall be and hereby is granted. It is further

ORDERED that the "Memorandum" issued by the Court on October 25, 1994 in the above-referenced proceeding shall be and hereby is amended to reflect the deletion of footnote 3 from page 8 of the Memorandum. [Editor's Note: Amendment incorporated for purposes of publication; subsequent footnotes renumbered.]

---

4. The penalties for violation of the TPA are set forth in T.C.A. § 45–6–218. That section provides that a conviction for a knowing violation of the TPA is punishable as a Class A misdemeanor.

In the opinion of this Court, FSC has knowingly violated the TPA. We therefore, refer this matter to the Office of the Attorney General for the State of Tennessee.